1   RICHARD R. WAITE (SBN 97942)
    MARY M. BEST (SBN 110220)
2   **KEENEY WAITE & STEVENS**
    A Professional Corporation
3   125 North Acacia Avenue, Suite 101
    Solana Beach, CA 92075
4   Telephone:   (858) 523-2130
    Facsimile:   (858) 523-2135
5
    WILLIAM D. MARLER, WSBA #17233
6   MARLER CLARK, LLP PS
    701 First Avenue, Suite 6600
7   Seattle, WA 98104
    Telephone:   (206) 346-1888
8   Facsimile:   (206) 346-1898
    (pending admission *pro hac vice*)
9
    Attorneys for Plaintiffs DEREK TRONE and
10  CINDY TRONE, husband and wife,
    Individually, and as Next Friends and
11  Natural Guardians of BRYSON TRONE, a minor

12

13                  **UNITED STATES DISTRICT COURT**

14                **NORTHERN DISTRICT OF CALIFORNIA**

15  DEREK TRONE and CINDY TRONE,        )
    husband and wife, individually, and as  )
16  Next Friends and Natural Guardians of   )
    BRYSON TRONE, a minor,              )
17                                      )
              Plaintiffs,               )
18                                      )
    v.                                  )   Case No.
19                                      )
    PEANUT CORPORATION OF               )
20  AMERICA, a Virginia corporation, and  )   **COMPLAINT FOR DAMAGES**
    Does 1-20, inclusive,               )
21                                      )
              Defendants.               )   **DEMAND FOR JURY TRIAL**
22                                      )

23                      <u>**COMPLAINT FOR DAMAGES**</u>

24          COME NOW the plaintiffs, by and through their attorneys of record, Richard R. Waite

25  and Mary Best, Keeney Waite & Stevens, and William D. Marler, Marler Clark, L.L.P., P.S., and

26  allege as follows:

27  ///

28  ///

                                  1
                              **COMPLAINT**

Dockets.Justia.com




1

**I. PARTIES**

2        1.     The plaintiffs are residents of Crescent City, Del Norte County, California.

3  The plaintiffs DEREK and CINDY TRONE are husband and wife and the natural parents of

4  BRYSON TRONE, a minor. The plaintiffs are residents of the State of California.

5        2.     The defendant, PEANUT CORPORATION OF AMERICA (PCA), is a

6  Virginia corporation, organized under the laws of the state of Virginia, authorized to do business in

7  the state of Virginia, with its principal office located at 2121 Wiggington Road, Lynchburg,

8  Virginia, 24502.

9        3.     At all times relevant hereto, PCA was a manufacturer and seller of various

10  peanut butter products, which it knowingly sold to manufacturers and distributors of its products for

11  use and sale nationwide, including the state of California.

12        4.     The true names and capacities of Defendants Does 1 through 20 (the "Doe

13  Defendants"), inclusive, are unknown to Plaintiffs, who therefore sue said Doe Defendants by such

14  fictitious names pursuant to Section 474 of the California Code of Civil Procedure. Plaintiffs are

15  informed and believe, and thereon allege, that Does 1 through 20 are in some capacity responsible

16  for the acts and omissions and damages herein alleged. Plaintiffs will seek leave of the Court to

17  amend this Complaint when said names and true capacities have been ascertained.

18        5.     Plaintiffs are informed and believe, and thereon allege that at all times

19  mentioned herein, except as otherwise stated, each of the Defendants and Doe Defendants, were the

20  agents and/or employees of each of the remaining Defendants. Plaintiffs lack sufficient information

21  or belief to allege whether, in so doing the things herein alleged, such Defendants and Doe

22  Defendants were acting within the scope of such agency or employment. Plaintiffs are informed and

23  believe that all of the Defendants are the alter egos of every other Defendant.

24

**II. JURISDICTION AND VENUE**

25        6.     This Court has jurisdiction over the subject matter of this action pursuant to

26  28 USC § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is

27  between citizens of different states, and because the defendant has certain minimum contacts with

28  ///

1    the State of California such that the maintenance of the suit in this district does not offend

2    traditional notions of fair play and substantial justice.

3            7.      Venue in the United States District Court for the Northern District of

4    California is proper pursuant to 28 USC § 1391(a)(2) because a substantial part of the events or

5    omissions giving rise to the plaintiffs' claims and causes of action occurred in this judicial district—

6    i.e., the plaintiff Bryson Trone's consumption of the PCA product that caused his illness.

7    Additionally, the defendant PCA was subject personal jurisdiction in this judicial district at the time

8    of the commencement of the action.

9                            **III. GENERAL ALLEGATIONS**

10                                   Salmonella

11           8.      Salmonella is an enteric bacterium, which means that it lives in the intestinal

12   tracts of humans and other animals, including birds. Salmonella bacteria are usually transmitted to

13   humans by eating foods contaminated with animal feces. Contaminated foods usually look and

14   smell normal. Contaminated foods are often of animal origin, such as beef, poultry, milk, or eggs,

15   but all foods, including vegetables, may become contaminated. Many raw foods of animal origin are

16   frequently contaminated, but fortunately thorough cooking kills Salmonella. A food handler who

17   neglects to wash his or her hands with soap and warm water after using the bathroom may also

18   contaminate food.

19           9.      Once in the lumen of the small intestine, the bacteria penetrate the epithelium,

20   multiply, and enter the blood within 24 to 72 hours. As few as 15-20 cells of Salmonella bacteria

21   can cause salmonellosis or a more serious typhoid-like fever. Variables such as the health and age of

22   the host and virulence differences among the serotypes affect the nature of the diagnosis. Infants,

23   elderly, hospitalized, and the immune suppressed are the populations that are the most susceptible to

24   disease and suffer the most severe symptoms.

25           10.     The acute symptoms of Salmonella gastroenteritis include the sudden onset of

26   nausea, abdominal cramping, and bloody diarrhea with mucous. There is no real cure for Salmonella

27   infection, except treatment of the symptoms.

28   ///

1       11.     Persons with severe diarrhea may require rehydration, often with intravenous

2  fluids. Salmonella can be treated with ampicillin, gentamicin, trimethoprim/sulfamethoxazole, or

3  ciprofloxacin. Unfortunately, some Salmonella bacteria have become resistant to antibiotics, largely

4  as a result of the use of antibiotics to promote the growth of feed animals.

5       12.     Persons with diarrhea usually recover completely, although it may be several

6  months before their bowel habits are entirely normal. A small number of persons who are infected

7  with Salmonella will go on to develop pains in their joints, irritation of the eyes, and painful

8  urination. This is called Reiter's syndrome. It can last for months or years, and can lead to chronic

9  arthritis, which is difficult to treat. Antibiotic treatment does not make a difference in whether or not

10  the person later develops arthritis.

11                      Past Peanut Butter Outbreaks

12       13.     The first documented outbreak, in 1996, of salmonellosis associated with the

13  consumption of peanut butter was reported in the Journal of Applied Microbiology in 2000.

14  Between April and June 1996, 15 persons with Salmonella enterica serovar Mbandaka infection

15  were reported in South Australia. Salmonella Mbandaka was isolated from three opened jars of

16  peanut butter from case households, and from three unopened jars from retail outlets. Further

17  investigation implicated roasted peanuts from a third Australian state as the source of the Salmonella

18  contamination

19       14     On February 14, 2007 the United States Food and Drug Administration

20  (FDA), as part of its investigation of a nationwide Salmonella outbreak, warned consumers not to eat

21  Peter Pan and Great Value brands of peanut butter with a product code beginning 2111, and

22  announced a recall of the products by their manufacturer, ConAgra. The CDC ultimately linked 628

23  persons infected from 44 states with the outbreak strain of Salmonella Tennessee to the consumption

24  of the product.

25                      PCA Peanut Butter Outbreak

26       15.     On January 9, 2009, the Minnesota Department of Agriculture (MDA)

27  announced a product advisory after MDA's preliminary laboratory testing indicated the presence of

28  Salmonella bacteria in a 5-pound container of King Nut brand creamy peanut butter manufactured by

1   defendant PCA. The contamination was discovered as a result of product testing initiated after an

2   MDH epidemiological investigation implicated King Nut creamy peanut butter as a likely source of

3   Salmonella infections in Minnesota residents. The Minnesota cases had the same genetic fingerprint

4   as the cases in the national outbreak.

5         16.     On January 10, 2009, King Nut announced that Salmonella has been found in

6   a five lb. tub of its peanut butter and that they were voluntarily recalling all of their peanut butter

7   products manufactured by PCA.

8         17.     On January 13, 2009, PCA announced a voluntary recall of peanut butter

9   produced in its processing facility located in Blakely, Georgia because it had the potential to be

10   contaminated with Salmonella. The FDA subsequently notified PCA that product samples

11   originating from its Blakely, Georgia, processing plant were tested and found positive for

12   Salmonella by laboratories in the states of Minnesota, Georgia, and Connecticut.

13         18.     On January 14, 2009, Kellogg Company announced a product hold on

14   Austin® and Keebler® branded Toasted Peanut Butter Sandwich Crackers, Peanut Butter and Jelly

15   Sandwich Crackers, Cheese and Peanut Butter Sandwich Crackers, and Peanut Butter-Chocolate

16   Sandwich Crackers because PCA is one of several peanut paste suppliers that the company used in

17   its Austin® and Keebler® branded peanut butter sandwich crackers.

18         19.     On January 16, PCA expanded its voluntary recall to include all peanut butter

19   produced on or after August 8, 2008, and all peanut paste produced on or after September 26, 2008,

20   in its Blakely, Georgia, plant because of potential Salmonella contamination.   That same day, the

21   Connecticut Department of Health confirmed it found Salmonella in an unopened jar of King Nut

22   brand peanut butter manufactured by PCA at its Blakely, Georgia, processing plant.

23         20.     Also on January 16, Kellogg Company announced a voluntary recall of certain

24   Austin® and Keebler® branded Peanut Butter Sandwich Crackers and select snack-size packs of

25   Famous Amos® Peanut Butter Cookies and Keebler® Soft Batch Homestyle Peanut Butter Cookies

26   because the products have the potential to be contaminated with Salmonella.

27         21.     On January 17, 2009, the FDA made an announcement to the public to avoid

28   eating ALL peanut butter-containing products.

1    22.    On January 19, 2009, Kellogg announced that FDA tests revealed that some of
2    its cracker products were contaminated with Salmonella.

3    23.    As of January 27, 2009, the Centers for Disease Control (CDC) counts 501
4    persons from 43 states infected with the same genetic outbreak strain of Salmonella Typhimurium,
5    and at least eight deaths.

6    24.    During investigation of the outbreak health officials learned of a number of
7    serious deficiencies at the PCA plant with regard to food safety and quality. On 12 different
8    occasions, peanut products were tested by PCA at the plant and found to be positive for Salmonella.
9    These tests included at least one positive result in peanut paste for Salmonella typhimurium. PCA
10   did not notify health officials.    Rather, PCA re-tested the paste, obtained a negative result and
11   shipped the product into interstate commerce. In each of the other 11 instances in which product
12   tested positive for Salmonella, PCA re-tested the product, obtained a negative result, and shipped the
13   product into interstate commerce.

14   25.    Health officials found numerous other deficiencies as well.  These included:
15          •A failure to clean the peanut paste line after the Salmonella typhimurium was
16          identified in the paste.
17          •    A failure to establish the effectiveness of the firm's roasting process as an
18          effective kill-step for pathogenic bacteria.
19          •    A failure to store finished food under conditions that would protect against
20          microbial contamination.  This included pallets of finished product stored within 3
21          feet of an area that swabbed positive for Salmonella Mbandaka.
22          •    Failure to store finished food under conditions that would protect against
23          microbial contamination.
24          •    The plant was not constructed in such a manner as to allow ceilings to be kept
25          in good repair.
26          •    The design of equipment and utensils fails to preclude the adulteration of food
27          with contaminants.

28   ///

1         &bull;    Proper precautions to protect food and food-contact surfaces from

2         contamination with microorganisms could not be taken because of deficiencies in

3         plant construction and design.

4         &bull;    Devices and fixtures were not designed and constructed to protect against

5         recontamination of clean, sanitized hands.

6         &bull;    Failure to conduct cleaning and sanitizing operations for utensils and

7         equipment in a manner that protects against contamination of food.

8         &bull;    Effective measures were not being taken to protect against contamination of

9         food on the premises by pests.

10                    Plaintiffs' Injuries

11     26.     The plaintiff Bryson Trone's illness was caused by consumption of peanut

12 butter product manufactured by defendant PCA.

13     27.     On multiple occasions in December, 2008, the Trone family purchased

14 "Austin" brand peanut butter crackers contained PCA peanut products at the Wal-Mart located in

15 Crescent City, California.

16     28.     Bryson Trone consumed the peanut butter crackers on multiple occasions up

17 to and including December 25, 2008.

18     29.     On or about December 26, Bryson Trone began to suffer from symptoms that

19 included fever, and profuse and painful bouts of diarrhea that turned bloody.

20     30.     Bryson Trone's symptoms worsened, and he was subsequently hospitalized

21 from January 1, 2009 through January 5, 2009. While hospitalized, Bryson Trone tested positive for

22 Salmonella Typhimurium, the serotype associated with the PCA contamination and recall.

23     31.     As of the filing of this Complaint, Bryson Trone continues to recover from the

24         effects of his Salmonella Typhimurium infection.

25     32     The plaintiffs have incurred and will continue to incur medical expenses, have

26 suffered and will continue to suffer pain, loss of enjoyment of life, emotional distress, and medical

27 problems in the future as a direct and proximate result of contaminated PCA peanut butter product.

28 ///

# IV. CAUSES OF ACTION

## Strict Liability—Count I

33.     Plaintiffs refer to and incorporate herein by reference all preceding paragraphs of the Complaint.

34     The defendant PCA was at all times relevant hereto the manufacturer and seller of the adulterated food product that is the subject of the action.

35.     The adulterated food product that defendant PCA manufactured, distributed, and/or sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained Salmonella, a deadly pathogen.

36.     The adulterated food product that the defendant PCA manufactured, distributed, and/or sold was delivered to the plaintiffs without any change in its defective condition. The adulterated food product that the defendant manufactured, distributed, and/or sold was used in the manner expected and intended, and was consumed by the plaintiff.

37.     The defendant PCA owed a duty of care to the plaintiffs to design, manufacture, and/or sell food that was not adulterated, that was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The defendant PCA breached this duty.

38.     The defendant PCA owed a duty of care to the plaintiffs to design, prepare, serve, and sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The defendant PCA breached this duty.

39.     The plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the defendant manufactured, distributed, and/or sold.

## Breach of Warranty—Count II

40.     Plaintiffs refer to and incorporate herein by reference all preceding paragraphs of the Complaint.

41.     The defendant PCA is liable to the plaintiffs for breaching express and implied warranties it made regarding the adulterated product that the plaintiffs purchased. These

1  express and implied warranties included the implied warranties of merchantability and/or fitness for

2  a particular use.  Specifically, the defendant PCA expressly warranted, through its sale of food to the

3  public and by the statements and conduct of its employees and agents, that the food it prepared and

4  sold was fit for human consumption and not otherwise adulterated or injurious to health.

5       42.     The plaintiffs allege that the Salmonella-contaminated food that defendant

6  PCA sold to the plaintiffs would not pass without exception in the trade and was therefore in breach

7  of the implied warranty of merchantability.

8       43.     The plaintiffs allege that the Salmonella-contaminated food that the defendant

9  PCA sold to the plaintiffs was not fit for the uses and purposes intended, i.e. human consumption,

10 and that this product was therefore in breach of the implied warranty of fitness for its intended use.

11      44.     As a direct and proximate cause of the defendant PCA's breach of warranties,

12 as set forth above, the plaintiffs sustained injuries and damages in an amount to be determined at

13 trial.

14                              Negligence—Count III

15      45.     Plaintiffs refer to and incorporate herein by reference all preceding paragraphs

16 of the Complaint.

17

18      46.     The defendant PCA owed a duty to the plaintiffs to use reasonable care in its

19 manufacture, distribution, and sale of its food product, which duty would have prevented or

20 eliminated the risk that the defendant PCA's food products would become contaminated with

21 Salmonella or any other dangerous pathogen.  The defendant PCA breached this duty.

22      47.     The defendant PCA had a duty to comply with all statutes, laws, regulations,

23 or safety codes pertaining to the manufacture, distribution, storage, and sale of its food product, but

24 failed to do so, and was therefore negligent.  The plaintiffs are among the class of persons designed

25 to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the

26 manufacture, distribution, storage, and sale of similar food products.

27      48.     The defendant PCA had a duty to properly supervise, train, and monitor its

28 respective employees, and to ensure its compliance with all applicable statutes, laws, regulations, or

1  safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products,

2  but it failed to do so and was therefore negligent.

3         49.    The defendant PCA had a duty to use ingredients, supplies, and other

4  constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise

5  complied with applicable federal, state, and local laws, ordinances, and regulations, and that were

6  clean, free from adulteration, and safe for human consumption, but it failed to do so and was

7  therefore negligent.

8         50.    As a direct and proximate result of the defendant PCA's acts of negligence,

9  the plaintiffs sustained injuries and damages in an amount to be determined at trial.

10                    Negligence Per Se—Count IV

11         51.    Plaintiffs refer to and incorporate herein by reference all preceding paragraphs

12  of the Complaint.

13         52.    The defendant PCA had a duty to comply with all applicable state and federal

14  regulations intended to ensure the purity and safety of their food product, including the requirements

15  of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 et seq.), and the California

16  adulterated food statutes.

17         53.    The defendant PCA failed to comply with the provisions of the health and

18  safety acts identified above, and, as a result, was negligent per se in its manufacture, distribution,

19  and sale of food adulterated with Salmonella, a deadly pathogen.

20         54.    As a direct and proximate result of conduct by the defendant PCA that was

21  negligent per se, the plaintiffs sustained injury and damages in an amount to be determined at trial.

22                    Punitive Damages – Count V

23         55.    Plaintiffs refer to and incorporate herein by reference all preceding paragraphs

24  of the Complaint.

25         56.    The plaintiffs at trial will present clear and convincing evidence that PCA

26  operated with a willful and conscious disregard for the rights and safety of others.  PCA's malicious

27  behavior included, but was not limited to, operating its plant in a manner likely to lead to

28  ///

1   contamination with human pathogens and knowingly shipping product contaminated with

2   Salmonella into interstate commerce, as described in paragraphs 22 and 23, above.

3                                  **PRAYER FOR RELIEF**

4         WHEREFORE, the plaintiffs pray:

5         (a)     That the defendant be served with a copy of this Complaint and answer as

6   required by law;

7         (b)     That the plaintiffs be granted a judgment against the defendant on Count I-IV

8   above for monetary damages, general and special, as to all counts in an amount deemed appropriate

9   by the Court to fully compensate the plaintiffs for the damages they have suffered and will continue

10   to suffer;

11         (c)     That the plaintiffs be granted a judgment against the defendant on Count V

12   above for punitive monetary damages in an amount deemed appropriate by the Court to fully

13   compensate the plaintiffs for their damages, to punish the defendant, and to deter like conduct in

14   others;

15         (d)     That the plaintiffs be awarded reasonable attorneys fees and costs as a result of

16   the undue litigiousness of the defendant resulting in the need to file this action;

17         (e)     That the plaintiffs be granted a trial by jury;

18         (f)     That the court award the plaintiffs the opportunity to amend or modify the

19   provisions of this complaint as necessary or appropriate after additional or further discovery is

20   completed in this matter, and after all appropriate parties have been served; and

21         (g)     That the plaintiffs be awarded such other and further relief as would be

22   equitable and just under the circumstances.

23                                       **JURY DEMAND**

24         The plaintiffs hereby demand a jury trial.

25   ///

26   ///

27   ///

28   ///

1  | Dated:  January 29, 2009

**KEENEY WAITE & STEVENS**
A Professional Corporation

By: *Mary M. Best*

Richard R. Waite, SBN 097942
Mary M. Best, SBN 110220
125 North Acacia Avenue, Suite 101
Solana Beach, CA 92075
Tel: 858.523.2133
Fax: 858.523.2135
rwaite@keenlaw.com

William D. Marler, WSBA #17233
MARLER CLARK, LLP PS
701 First Avenue, Suite 6600
Seattle, WA 98104
Tel. 206.346.1888
Fax: 206.346.1898
(pending admission *pro hac vice*)
bmarler@marlerclark.com

Attorneys for Plaintiffs

12